FILED

Apr 11 2019, 10:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Laura B. Conway
Steven C. Earnhart
Thrasher Buschmann & Voelkel, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Thomas F. Bedsole
Maggie L. Smith
Jenai M. Brackett
Frost Brown Todd LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

The Village Pines at the Pines of Greenwood Homeowners' Association, Inc.,

*Appellant-Plaintiff*,

v.

Pines of Greenwood, LLC, and Arbor Homes, LLC,

*Appellees-Defendants*.

April 11, 2019

Court of Appeals Case No. 18A-PL-135

Appeal from the Johnson Superior Court

The Honorable Marla Clark, Judge

Trial Court Cause No. 41D04-1111-PL-86

**Brown, Judge.**

[1] The Village Pines at the Pines of Greenwood Homeowners' Association, Inc., (the "HOA") appeals the trial court's entry of judgment on its claims for breach of fiduciary duty and breach of contract in favor of Pines of Greenwood, LLC ("Pines") and Arbor Homes, LLC ("Arbor Homes"). Reviewing the trial court's findings and judgment under the clear error standard, we conclude that Pines and Arbor Homes violated the stated procedure for amending relevant covenants, conditions, and restrictions affecting the parties, and remand for a hearing on damages on the breach of contract claim. We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[2] The HOA is a not-for-profit corporation organized under the laws of the State of Indiana with a principal place of business in Greenwood, Indiana, its primary purpose being to manage the residential community commonly known as Village Pines at the Pines of Greenwood (the "Neighborhood"). Pines developed and constructed the Neighborhood, and Arbor Homes was the exclusive builder of all of its single-family homes.

[3] On January 24, 2000, The Declaration of Covenants, Conditions and Restrictions and Grant and Reservation of Easements for The Village Pines at the Pines of Greenwood (the "Declaration") was recorded as Instrument No. 2000-001680 in the Office of the Recorder of Johnson County by Pines and Arbor Homes. The Declaration provided that "Association shall mean The Village Pines at The Pines of Greenwood Home Owners Association," – that is, the HOA; that "Declarant shall mean [Pines]" and "[a]s long as [Arbor Homes]

is the exclusive builder of single family homes on the Lots, [Arbor Homes] shall have the same rights as the Declarant hereunder"; and that "Owner shall mean the Person or Persons, including Declarant, holding fee simple interest to a Lot, excluding those having such interest merely as security for the performance of an obligation." Exhibits Volume III at 15-16, 18. It provided that "Development Period shall mean the period of time during which the Declarant owns at least one (1) lot," that "Lot shall mean and refer to any and each plot of land included in the Property[1] designed and intended for use as a building site for a single family residence," and that "Annual Assessment shall mean a charge against a particular Owner and his Lot, representing a portion of the Common Expenses[2] which are to be levied among all Owners and their Lots in the Property in the manner and proportions provided herein." *Id.* at 15-17.

[4] Beginning in 2000, Pines was in charge of the HOA and had the sole power to elect officers and the HOA's Board of Directors (the "Board"). Article II of the Declaration set forth provisions for the HOA and provided in part that the Board would manage the HOA's affairs. Section 2.3 provided in part that "[e]very Owner of a Lot, except as herein provided to the contrary, shall be

---

[1] Section 1.33 of the Declaration defines "Property" to mean "the real estate described in the attached Exhibit 'A'." Exhibits Volume III at 18. Stipulated Exhibit 1 contains a survey document titled "Exhibit 'A' The Village Pines of Greenwood." *Id.* at 55.

[2] Section 1.14 of the Declaration defines "Common Expenses" to mean in part "those expenses for which the Association is responsible under this Declaration, including the actual and estimated costs of: maintenance, management, operation, repair and replacement of the Common Areas . . . , and any Improvements thereon, or unpaid Special Assessments." Exhibits Volume III at 16.

entitled and required to be a member[3] of the Association" and that "[e]xcept as herein otherwise expressly provided, no person or entity other than an Owner or Declarant may be a member of the Association, and a membership in the Association may not be transferred except in connection with the transfer of title to a Lot." *Id.* at 19.

[5]     Article V of the Declaration set forth the HOA's "Maintenance Funds and Assessments" and provided in part:

> 5.1  Personal Obligation of Assessments.  Declarant, on behalf of itself and all future Owners, hereby covenants and agrees to pay, and each Owner by accepting title to a Lot or any interest therein, whether or not it shall be expressed in the deed or other instrument conveying title, shall be deemed to covenant and agree to pay to the Association, Annual Assessments and other amounts as required or provided for in this Declaration. Amounts payable for Annual Assessments and Special Assessments (as generally defined in Sections 5.5 and 5.7, respectively) are generally referred to herein as "Assessments." Other amounts payable by an Owner to the Association, (or payable with respect to an Owner's Lot), including late charges, fines, penalties, interest, attorneys fees and other costs and expenses incurred by the Association in collecting unpaid amounts shall be added to the Annual or Special Assessments, charged to his Lot and shall be enforceable and collectible as Annual or Special Assessments. . . .
>
> Subject to the provisions hereof, the Board shall have the power and authority to determine all matters in connection with Annual

---

[3]  Section 1.26 of the Declaration defines "Member" to mean "any Person holding a Membership in the Association," and section 1.31 of the Declaration defines "Person" to mean a "natural individual or any other entity with the legal right to hold title to real property."  Exhibits Volume III at 17-18.

or Special Assessments, including, without limitation, power and authority to determine where, when and how Assessments shall be paid to the Association, and each Owner shall comply with all such determinations.

5.2 <u>Maintenance Funds of Association</u>. The Board shall establish no fewer than two (2) separate Association Maintenance Funds, into which shall be deposited all monies paid to the Association, and from which disbursements shall be made, as provided herein, in the performance of functions by the Association under this Declaration. The Association Maintenance Funds may be established as trust accounts at a banking or savings institution, in federally insured accounts, and shall include: (1) an Operating Fund for current Common Expenses of the Association, (2) an adequate Reserve Fund for capital Improvements, replacements, painting and repairs of the Common Areas (which cannot normally be expected to occur on an annual or more frequent basis) . . . . The Board shall establish a Capitalization Account which shall consist of at least fifty percent (50%) of the capital contributions made by Owners pursuant to Section 5.12 hereof.

* * * * *

5.5 <u>Annual Assessments/Commencement-Collection</u>. Annual Assessments, and any monthly installment related thereto, shall commence on the first day of the first calendar month following the Closing of the sale of the first Lot. Thereafter, the Association is specifically authorized to enter into subsidy contracts or contracts for "in kind" contribution of services, materials, or a combination of services and materials with the Declarant or other entities for payment of Common Expenses.

All Annual Assessments shall be assessed equally against the Members and their Lots based upon the number of Lots owned by each Member. Annual Assessments for fractions of any month involved shall be prorated. Subject to the terms of any subsidy contract, Declarant shall pay to the Association until the

Applicable Date, an amount equal to the difference, if any, between the expenditures of the Association made pursuant to this Article V and the aggregate amount of the Annual Assessments collected by the Association. From time to time the Board may determine that all excess funds in the Operating Fund be retained by the Association and used to reduce the following year's Annual Assessments.

* * * * *

5.6 <u>First Annual Assessment and Maximum Annual Increases</u>.

[] <u>First Annual Assessment</u>. The initial Annual Assessment for the fiscal year in which Assessments first commence shall be calculated as determined from the Budget. The Board shall estimate and prepare a Budget for the costs and expenses to be incurred by the Association during the first Fiscal Year . . . . All costs and expenses incurred (i) in fulfilling the financial obligations of the Association prior to the first Fiscal Year or (ii) ordinarily and necessarily by the Association in excess of Assessment installments to be paid during that first partial fiscal year shall be the responsibility of Declarant, and Declarant hereby covenants to bear and to pay or otherwise satisfy such financial obligations.

5.7 <u>Special Assessments</u>. In addition to Annual Assessments, the Association may levy Special Assessments, at such frequency and in such amounts as established by the Board, payable over the period of an Association Fiscal Year (i) for the purpose of defraying, in whole or in part, the costs of any acquisition, construction, reconstruction, maintenance, repair or replacement provided for or required pursuant to Article II; (ii) for the purpose of defraying any other expense incurred or to be incurred by the Association as provided in this Declaration; or (iii) to cover any deficiency in the event that, for whatever reasons, the amount received by the Association from Annual Assessments is less than the amount determined to be necessary and assessed by the Board. Special Assessments for these purposes may not be

levied unless approved by Members holding a majority of the votes held by all Members.

5.8  Time for Payments.  Each installment of the Annual Assessment shall be due on the first day of the period covered by said installment.  The amount of any Assessment, late charge, fine, penalty or other amount payable by an Owner or Resident with respect to such Owner's Lot shall become due and payable as specified herein and if said payment is not received, then said Owner shall also be responsible for any late charges, interest, fines, penalties or attorneys fees related thereto. . . .  Annual Assessments shall be paid and collected on a quarterly basis or at such other frequency as may be adopted by the Board.

\* \* \* \* \*

5.12  Initial Capital Contributions to the Association. At the closing of the purchase of a Lot from Declarant, each Owner of a Lot shall contribute to the capital of the Association, an amount equal to One Hundred Dollars ($100.00).  This amount shall be disbursed at the closing to the Association or to the Declarant if Declarant has previously advanced such funds to the Association.  For purposes of this Declaration, Declarant, its assignees or assigns, and Arbor shall not be considered an Owner.

*Id.* at 29-32, 34.

The Declaration provided mechanisms for amendment, which stated in part:

12.2  Termination and Amendment.

(a) Notice of the subject matter of a proposed amendment to this Declaration in reasonably detailed form shall be included in the notice of any meeting or election of the Association at which a proposed amendment is to be considered. The resolution shall be adopted by the vote, in person or by proxy, or written consent of

Members representing not less than sixty-seven percent (67%) of the voting power of the Association . . . .

* * * * *

12.3 By Declarant. Notwithstanding anything herein to the contrary, Declarant hereby reserves the right until the expiration of the Development Period to make such amendments to this Declaration as may be deemed necessary or appropriate by Declarant, without the approval of any other person or entity, in order to bring Declarant into compliance with the requirements of any statute ordinance, regulation or order of any public agency having jurisdiction thereof, or to correct clerical or typographical errors in this Declaration or any amendment or supplement hereto; provided that Declarant shall not be entitled to make any amendment which has a materially adverse effect on the rights of any Mortgagee, nor substantially impairs the benefits of this Declaration to any Owner or substantially increases the obligations imposed by this Declaration on any Owner. Each amendment to the Declaration shall be executed by Declarant only in any case where Declarant has the right to amend this Declaration without any further consent or approval, and otherwise by the Association. All amendments shall be recorded in the Office of the Recorder of Marion County, Indiana, and no amendment shall become effective until so recorded.

*Id.* at 47-48.

At some point, the Reserve Fund was established as required by Section 5.2 of the Declaration. On May 18, 2006, the HOA held a meeting, which produced in part the following meeting minutes:

III. PROPOSED AMENDMENTS

A. The Board is making a recommendation to amend [the Declaration] to address the following items:

1. Parking 8.2 – Parking and Vehicular Restrictions
   . . .
2. Commercial Vehicle Parking 8.2 – Parking and Vehicular Restrictions . . .
3. Temporary Play Equipment 8.3 – Nuisances . . .
4. Trash 8.8 – Trash Containers . . .
5. A vote by proxy is anticipated the mail [sic] by June 2006.
   a. The Board promised to include in the voting packet.
      1. A copy of the 2006 Budget.
      2. A copy of the financial statement.
      3. A response to any of their questions the Board left this meeting with.

* * * * *

5. A legal opinion for Arbor on the dues issue.

* * * * *

This issue has taken on a life of its own. It will be addressed in a separate mailing.

* * * * *

V. DEVELOPER CONTRIBUTIONS

A. Please refer to [1.] 5.1 Personal Obligation of Assessments. . . . [2.] 5.1 Annual Assessments/Commencement-Collection.[4] . . . [and 3.] 5.12 Initial Capital Contributions to the

---

[4] The meeting minutes' statement "5.1 Annual Assessments/Commencement-Collection" appears to be a scrivener's error, Exhibits Volume III at 168, as the text which follows quotes Section 5.5 of the Declaration. *See id.* at 18.

Association. . . .[5] <u>For purposes of this Declaration, Declarant, its assignees or assigns, and Arbor shall not be considered an Owner</u>.

\* \* \* \* \*

As stated above, this issue has taken on a life of its own and will be answered in a future mailing.

VI. RESERVE CAPITAL

[A.] 5.12 Initial Capital Contributions to the Association. . . .

[B.] 5.2 Maintenance Funds of Association. . . .

\* \* \* \* \*

C. Reserve Analysis – Quotes have been requested to complete a Reserve Analysis to determine the future needs of the neighborhood. (desire completion date is 90 to 120 days)
   1. This will create a plan for long term future maintenance.
      a. Driveways
      b. Fences . . .
      c. Common Areas . . .
   There was some discussion about what information would be given to the Reserve Analysis Group to allow them to make create [sic] their report.

*Id.* at 166-170.

[8] On November 6, 2006, Reserve Advisors, Inc. ("Reserve Advisors") issued a reserve study obtained for the HOA based on Reserve Advisors' September 20,

---

[5] In the meeting minutes, an ellipsis follows "5.12 Initial Capital Contributions to the Association." Exhibits Volume III at 168.

2006 inspection of the Neighborhood. The study, as a "budget planning tool," identified "the current status of the reserve fund and a stable and equitable Reserve Funding Plan to offset the anticipated future major common area expenditures," found that the "unaudited cash status of the reserve fund, as of July 31, 2006, as reported by Management is $31,800," and "[i]f the Association were to continue to fund reserves at its 2006 budgeted amount . . . , the reserve fund would incur a potential shortage by 2010," and recommended that "the Association adopt annual Reserve Contributions of $21,000 in 2007, $40,200 in 2008 and $59,400 in 2009." *Id.* at 81-83.

[9] On July 23, 2007, Pines recorded the First Amendment to the Declaration (the "First Amendment") as Instrument No. 2007-017873 in the Office of the Recorder of Johnson County, and in doing so followed the procedure outlined in Section 12.2(a) of the Declaration. The First Amendment amended Section 8.2, titled Parking and Vehicle Restrictions; Section 8.3, titled Nuisances; and Section 8.8, titled Trash Containers. *Id.* at 58-59.

[10] On July 2, 2008, Pines and Arbor Homes recorded the Second Amendment to Declaration (the "Second Amendment") as Instrument No. 2008-014227 in the Office of the Recorder of Johnson County,[6] which states:

---

[6] The parties stipulated that the Second Amendment was recorded by Pines and Arbor Homes. *See* Appellant's Appendix Volume 2 at 37. The Second Amendment states it was "entered into as of this 26th day of June, 2008, by PINES," and indicates that it was signed by Donald M. Chesney, "V.P. of Field Operations" for Arbor Investments, LLC. *Id.* at 61, 64.

**WHEREAS**, Declarant's intent at the time the Declaration was prepared and recorded was to provide for Declarant to fund the deficit of the Association's Common Expenses, if any, prior to the Applicable Date, and that Declarant would not otherwise be responsible for payment of the Association's Common Expenses; and

**WHEREAS**, the Declaration contains certain clerical and typographical errors.

**WHEREAS**, such errors result in unintended ambiguities regarding Declarant's obligations to contribute toward the Association's Common Expenses;

**WHEREAS**, Declarant wishes to correct such errors in the Declaration;

**WHEREAS**, pursuant to the terms of Section 12.3 of the Declaration, Declarant has the right until the expiration of the Development Period to make amendments to the Declaration as may be deemed necessary or appropriate by Declarant, without the approval of any other person or entity, to correct clerical errors in the Declaration; and

**WHEREAS**, Declarant represents that the Development Period has not terminated.

**NOW THEREFORE**, Declarant is hereby entering into this Second Amendment as follows;

1.  The first sentence of Section 1.24, Lot, shall be deleted and replaced with the following:

    Lot shall mean and refer to any and each plot of land included in the Property identified as a lot on any recorded plat of the Property and designed and intended for use as a building site for a single family residence.

2. Section 1.30, <u>Owner</u>, shall be deleted and replaced with the following:

Except as otherwise provided in Article V, Owner shall mean the Person or Persons, including Declarant, holding fee simple interest to a Lot, excluding those having such interest merely as security for the performance of an obligation. The term "Owner" shall include a seller under an executory contract of sale but shall exclude Mortgagees.[]

3. The first sentence of Section 5.1, <u>Personal Obligation of Assessments</u>, shall be deleted and replaced with the following:

Each Owner (other than Declarant), by accepting title to a Lot or any interest therein, whether or not it shall be expressed in the deed or other instrument conveying title, shall be deemed to covenant and agree to pay to the Association, Annual Assessments and other amounts as required or provided for in this Declaration.

4. The first sentence of Section 5.5 <u>Annual Assessments/Commencement-Collection</u>, shall be deleted and replaced with the following:

Annual Assessments, and any monthly installment related thereto, shall commence on the first day of the first calendar month following the Closing of the first sale of a Lot to a person other than Declarant.

*Id.* at 61-64.

[11] On November 5, 2009, the HOA was turned over to the homeowners of the Neighborhood.

[12] On November 4, 2011, the HOA filed a complaint against Pines, Arbor Homes, and Arbor Investments, LLC,[7] asserting claims for breach of fiduciary duty and breach of contract.[8] On April 28, 2017, the HOA, Pines, and Arbor Homes jointly stipulated to certain facts and exhibits. On May 9, 2017, a bench trial was held at which Megan Judson, an owner of a property management company and current property manager for the Neighborhood, testified that she built a home in the Neighborhood, closed on it in January 2008, and became a member of the Board "a few years after living there," and indicated that the Second Amendment was not approved "by the members of the [HOA]." Transcript Volume II at 18, 27.

[13] Judson testified that the Assessments were calculated "based on the Budget" and indicated that the Board would approve a Budget based upon the expected expenses for the Neighborhood "that includes operating and the reserve and, then, we'll divide that up amongst the number of homeowners." *Id.* at 22. She indicated that the assessments for the HOA had changed over time, answered affirmatively when asked "[w]ould the Assessments have been started around thirty-two dollars," and testified "[m]aybe like in 2000 when it was, it was very first building." *Id.* at 30. She was shown Stipulated Exhibit 10, a spreadsheet

---

[7] An October 19, 2015 entry in the chronological case summary states, "Motion for Judgment on the Pleadings Filed Pursuant to TR 5(F)(3) 'Defendant Arbor Investments, LLC's Motion for Judgment on the Pleadings'," and a February 3, 2016 entry states, "Order Granting Motion for Judgment on the Pleadings." Appellant's Appendix Volume II at 7-8.

[8] The record does not contain a copy of the complaint. The HOA, Pines, and Arbor Homes agree that the complaint alleged breach of contract and breach of fiduciary duty.

which "relates to the Lot numbers within [the Neighborhood], and the transfer dates for when the lots were transferred by Declarant to Third Parties," Appellant's Appendix Volume II at 40. She testified that it represented the Lots owned by Pines or Arbor Homes, that it included the date "that Assessments should have begun on . . . each property," the date "that they should have ended because the property sold from the builder to a homeowner," and the amount for each Lot. Transcript Volume II at 30. She testified that the principal balance due for Assessments on these Lots was $245,982.50, the amount due for late fees was $148,275.00, and the total amount due for Assessments and late fees was $394,257.50. Counsel for the HOA moved to admit the portions of Stipulated Exhibit 10 "that have not been stipulated to," and the court admitted it over objection.[9]

[14] On October 2, 2017, the trial court entered judgment in favor of Pines and Arbor Homes and against the HOA on all claims in its Judgment Order. The Order found in part that Pines recorded the Second Amendment and that the Second Amendment was not approved by Members of the HOA and no meeting was held to vote on it. It also found that Pines and Arbor Homes did not pay assessments to the HOA from June 2000 to November 2009; that

---

[9] Before the court admitted Stipulated Exhibit 10, counsel for Arbor Homes and Pines argued in part that the HOA had "simply taken the amounts that were charged to homeowners at the time and spread that out over all of the Lots which is improper," and counsel for the HOA responded that "the Declarations clearly state that the Assessments have to be assessed equally across all Lots and this is the calculation showing the dates that Arbor, the Defendant, owned the Lot and, therefore, these are the dates that the Assessments would be owed." Transcript Volume II at 35.

Sections 5.5 and 5.6 set up a "'Deficit Funding' obligation" for Pines; that the "Board of Directors for the Village Pines" established and funded the Reserve Fund, which was funded during the Development Period; that Pines and Arbor Homes made contributions to the HOA in 2000, 2001, 2002, 2003, and 2005; and that, upon turnover of the HOA to the homeowners, as of November 30, 2009, the total amount in the Reserve Fund was $37,934.32. Appellant's Appendix Volume II at 21-22. The Order states in part:

> 55. On three occasions during the Defendants' control of the Association, money was removed from the Reserve Fund accounts.
>
> 56. On October 12, 2001, $3000.00 was taken from the Union Planters Reserve Fund account and deposited in the Operating Account.
>
> 57. On January 17, 2003, $12,534.64 was removed from the Union Planters Reserve Fund and deposited in the Operating Account to pay the lawn care provider.
>
> 58. On April 10, 2008, $14,661.05 was removed from a Community Association Banc Reserve Fund and deposited in the Operating Account to pay for neighborhood plants.
>
> 59. On July 24, 2009, $5,082.00 was removed from a Community Association Banc Operating Account and deposited in a Reserve Fund account.
>
> 60. There was no evidence describing the use of these Funds from the Reserve Fund, why the transfers were made or who authorized or requested the transfers.

*Id.* at 24. The Order found that the HOA's "expenditures were paid," "the deficit Funding system set forth under the Declaration satisfied all actual

expenditures of the [HOA] on an annual basis" and that the HOA "did not suffer any actual damages because its budget was fully funded every year." *Id.* at 34.

[15] Further, the Order found "no evidence of any impediment that would have prevented a member of the [HOA] from filing a derivative action on behalf of the [HOA] against the [Board] in 2006" based on the allegations contained in the lawsuit, as referenced in the minutes of the May 18, 2006 meeting. *Id.* at 28. With regard to the HOA's fiduciary duty claim, the order found that "Funds were transferred between the Reserve Fund and the operating account and vice versa as needed. At no time was the Reserve Fund not funded. These transactions do not amount to recklessness or willful misconduct. Further, there is no evidence that the Defendants had any part in these transactions." *Id.* at 32-33. The HOA filed a motion to correct error, which the court denied.

### *Discussion*

[16] When, as here, the trial court enters findings of fact and conclusions, our standard of review is well-settled:

> We may not set aside the findings or judgment unless they are clearly erroneous. In our review, we first consider whether the evidence supports the factual findings. Second, we consider whether the findings support the judgment. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. A judgment is clearly erroneous if it relies on an incorrect legal standard. We give due regard to the trial court's ability to assess the credibility of the witnesses. While we defer substantially to findings of fact, we do

> not defer to conclusions of law. We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment.

*State v. IBM*, 51 N.E.3d 150, 158 (Ind. 2016) (internal quotations and citations omitted). In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997).

[17] Here, the HOA appeals from a negative judgment and will prevail only if it establishes that the judgment is contrary to law. *See Woodsmall v. Lost Creek Tp. Conservation Club, Inc.*, 933 N.E.2d 899, 902 (Ind. Ct. App. 2010) (citing *Fowler v. Perry*, 830 N.E.2d 97, 102 (Ind. Ct. App. 2005)), *trans. denied*. A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead to only one conclusion, but the trial court reached a different conclusion. *Id.*

[18] We note initially that, to the extent the HOA argues that Pines and Arbor Homes owed it a fiduciary duty, a breach of fiduciary duty is a tort claim for injury to personal property and the applicable statute of limitation is two years. *See City of E. Chicago, Ind. v. E. Chicago Second Century, Inc.*, 908 N.E.2d 611, 618 (Ind. 2009) (citing *Del Vecchio v. Conseco, Inc.*, 788 N.E.2d 446, 451 (Ind. Ct. App. 2003); Ind. Code § 34-11-2-4), *reh'g denied*. The Indiana Supreme Court in dealing with a breach of fiduciary duty claim has declared that "a cause of action for a personal injury claim accrues and the statute of limitation begins to

run when the plaintiff knew, or in the exercise of ordinary diligence could have discovered, that an injury had been sustained as a result of the tortious act of another." *Id.* (citing *Malachowski v. Bank One, Indianapolis*, 590 N.E.2d 559 (Ind. 1992)). For a cause of action to accrue, it is not necessary that the full extent of damage be known or even ascertainable, but only that some ascertainable damage has occurred. *Myers v. Maxson*, 51 N.E.3d 1267, 1276 (Ind. Ct. App. 2016), *trans. denied*.

[19] The record reveals that the HOA held a meeting on May 18, 2006, at which representatives of the Board and Homeowners from forty-eight addresses were present. At the meeting a discussion on an anticipated June 2006 vote by proxy was held and the Board promised to include in the voting packet copies of the 2006 Budget, financial statement, and legal opinions for Arbor Homes and for the HOA on "the dues issue," which the meeting minutes figuratively described as having "taken on a life of its own." Exhibits Volume III at 167. Arbor Homes's legal position regarding Arbor Homes paying dues for each lot was explained, and several property owners expressed that the Declaration states that Arbor Homes should be paying dues. On appeal, the HOA claims that Pines and Arbor Homes breached their "fiduciary duty to [it] by failing to properly fund the reserve account." Appellant's Brief at 19. We observe that the capital reserve fund was discussed at the meeting, as were quotes that had been requested "to complete a Reserve Analysis to determine the future needs of the neighborhood," and we note that one homeowner commented "it was imperative that the property owners make sure that the reserve capital is

adequate before Arbor is finished" and wanted "to make the point that these things needed to be determined while the property owners could make Arbor financially responsible." Exhibits Volume III at 168-170. The reserve study obtained for the HOA was issued on November 6, 2006, identified "the current status of the reserve fund and a stable and equitable Reserve Funding Plan to offset the anticipated future major common area expenditures," found that funding reserves at the 2006 budgeted amount "would incur a potential shortage by 2010" in the reserve fund, and recommended that the HOA adopt annual Reserve Contributions of $21,000 in 2007, $40,200 in 2008 and $59,400 in 2009. *Id.* at 81-82. Further, the trial court found that no evidence of any impediment would have prevented a member of the HOA from filing a derivative action on behalf of the HOA against the Board in 2006. The HOA filed its complaint against Pines and Arbor Homes on November 4, 2011. Based on our review of the record, we conclude that some ascertainable damage had occurred that, in the exercise of ordinary diligence, could have been discovered prior to the expiration of the applicable statute of limitation period.

[20] We next turn to the HOA's breach of contract claim. Covenants, like the Declaration, are promises relating to real property that are created in conveyances or other instruments. *See Land Innovators Co., L.P. v. Bogan*, 15 N.E.3d 23, 31 (Ind. Ct. App. 2014) (citing *Columbia Club, Inc. v. American Fletcher Realty Corp.*, 720 N.E.2d 411, 417 (Ind. Ct. App. 1999), *trans. denied*), *trans. denied*. Covenants may be express or implied and are a species of express contract. *Id.* Thus, real covenants, when written, are generally construed in the

same manner as other written contracts. *Id.* (citing *Keene v. Elkhart Cnty. Park & Recreation Bd.*, 740 N.E.2d 893, 896-897 (Ind. Ct. App. 2000)).

[21] To the extent we must interpret the Declaration, "construction of the terms of a written contract is a pure question of law for the court, reviewed de novo." *Harrison v. Thomas*, 761 N.E.2d 816, 818 (Ind. 2002). "The goal of contract interpretation is to determine the intent of the parties when they made the agreement." *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012), *reh'g denied*. We determine the intent of the contracting parties by analyzing the contractual language within the four corners of the document. *Beazer Homes Ind., LLP v. Carriage Courts Homeowners Ass'n, Inc.*, 905 N.E.2d 20, 23 (Ind. Ct. App. 2009) (*citing Collins v. McKinney*, 871 N.E.2d 363, 372 (Ind. Ct. App. 2007)), *reh'g denied*, *trans. denied*. If that language is unambiguous, we may not look to extrinsic evidence to expand, vary, or explain the instrument. *Id.* (citing *Ethyl Corp. v. Forcum-Lannom Assocs., Inc.*, 433 N.E.2d 1214, 1217 (Ind. Ct. App. 1982)). "If the language is unambiguous, we give it its plain and ordinary meaning in view of the whole contract, without substitution or addition." *Care Group Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 752 (Ind. 2018) (*citing Ryan v. TCI Architects/Eng'rs/Contractors, Inc.*, 72 N.E.3d 908, 914 (Ind. 2017); *State v. Int'l Bus. Machs. Corp.*, 51 N.E.3d 150, 160 (Ind. 2016)).

[22] The HOA maintains that the trial court, having found that Pines and Arbor Homes recorded the Second Amendment, erred in not making any finding that Pines and Arbor Homes breached the Declaration's amendment process. Pines and Arbor Homes argue in response that, in amending the Declaration and

recording the Second Amendment, they were correcting "unintended ambiguities" caused by prior scrivener's errors and effectuating "the intent already found in Section 5.12, which provides, 'For purposes of this Declaration, Declarant, its assignees or assigns, and Arbor shall not be considered an Owner.'" Appellees' Brief at 16-17. Characterizing the Second Amendment as a "clean-up" amendment, Pines and Arbor Homes contend without specific citation to the record that, "when preparing to turn over control and funding of the HOA to the homeowners," they "still believed their funding obligations in Section 5.5 and 5.6 – as well as their actual deficit funding practices over the years – made it clear that they would not also be considered 'Owners' for purposes of paying additional 'per lot' Annual Assessments that homeowners paid pursuant to Section 5.1." *Id.* at 15. Citing to the stipulated exhibit consisting of the May 18, 2006 HOA Meeting minutes, they assert that the meeting participants were "informed that Management Company had hired an attorney for the HOA separate from Developer's attorney to examine [the Declaration] and provide a determination regarding the Board of Directors' prior conclusion that [the Declaration] did not contemplate collecting Annual Assessments on a per lot basis from Developer/Builder." *Id.* at 13.

[23] To the extent that Pines and Arbor Homes argue that they recorded the Second Amendment in accordance with Section 12.3 of the Declaration, Section 12.3 provides in part that "Declarant hereby reserves the right" to make such amendments to the Declaration without the approval of any other person or

entity to correct "clerical or typographical errors in this Declaration." Exhibits Volume III at 48. A "clerical error" is "an error resulting from a minor mistake or inadvertence . . . ; esp., a drafter's or typist's technical error that can be rectified without serious doubt about the correct reading." *See* BLACK'S LAW DICTIONARY (10th ed. 2014). We further note that Section 12.3 goes on to qualify the above-mentioned right and states that Pines "shall not be entitled to make any amendment which has a materially adverse effect on the rights of any Mortgagee, nor substantially impairs the benefits of this Declaration to any Owner or substantially increases the obligations imposed by this Declaration on any Owner." Exhibits Volume III at 48.

[24] On January 24, 2000, when it was adopted, the Declaration expressly stated that Pines "on behalf of itself and all future Owners, hereby covenants and agrees to pay, and each Owner by accepting title to a Lot or any interest therein, whether or not it shall be expressed in the deed or other instrument conveying title, shall be deemed to covenant and agree to pay to the Association, Annual Assessments and other amounts as required or provided for in this Declaration." *Id.* at 29. It additionally contemplated that "[a]ll Annual Assessments shall be assessed equally against the Members and their Lots based upon the number of Lots owned by each Member." *Id.* at 31. We cannot agree that the Second Amendment, which removed Pines and Arbor Homes from the definition of Owners for purposes of Article V and the Annual Assessment obligations in that article, merely corrected clerical or typographical errors.

To the extent that Pines and Arbor Homes contend that the Second Amendment did not increase any burden on any homeowner or substantively change any homeowner's rights or obligations "as the HOA's annual budgets were fully funded every year through at least December 31, 2008," and argue that "because there were no unpaid, unbudgeted, or outstanding amounts, the HOA had not shown that it could have suffered any damages," Appellees' Brief at 17, 35, we note that the articles of incorporation and bylaws of a non-profit corporation constitute a contract between the corporation and its members and among the members themselves, *Lynn v. Windridge Co-Owners Ass'n, Inc.*, 743 N.E.2d 305, 313 (Ind. Ct. App. 2001), *reh'g denied*, *trans. denied*, and that a party who fails to make payments as required by a contract is guilty of a breach thereof. *Henthorne v. Legacy Healthcare, Inc.*, 764 N.E.2d 751, 758 (Ind. Ct. App. 2002). The Declaration specifies that Pines, "on behalf of itself and all future Owners," covenanted and agreed to pay Annual Assessments and "other amounts as required or provided for in this Declaration." Exhibits Volume III at 29. Under a plain reading, the Declaration requires all Annual Assessments to "be assessed equally against the Members and their Lots," contemplates that the assessments would be "based upon the number of Lots owned by each Member," and defines "Member" to mean "any Person" – *i.e.* "any . . . entity with the legal right to hold title to real property" – "holding a Membership in the Association" and "Owner" to mean the "Person or Persons, *including Declarant*, holding fee simple interest to a Lot." *Id.* at 17-18, 31 (emphasis added). After due consideration of the stipulated exhibits, evidence, and testimony presented at trial, and in light of the court's finding that Pines and Arbor Homes did not pay assessments to the

Association from June 2000 to November 2009, we are not persuaded that the HOA did not suffer any damages.

[26] The record reveals that Section 12.2 of the Declaration requires that a resolution of an amendment to the Declaration "shall be adopted by the vote, in person or by proxy, or written consent of Members representing not less than sixty-seven percent (67%) of the voting power of the Association." *Id.* at 34. In their April 28, 2017 submission, the Parties jointly stipulated that Pines and Arbor Homes recorded the Second Amendment. In its order, the court found that the Second Amendment was not approved by Members of the HOA and that no meeting was held to vote on it. Pines and Arbor Homes violated Section 12.2 of the Declaration in recording the Second Amendment.

## *Conclusion*

[27] For these reasons, we affirm the court's judgment on the breach of fiduciary claim, and because we find that Pines and Arbor Homes did not properly record the Second Amendment, we reverse and remand for a hearing on damages on the breach of contract claim.

Affirmed in part, reversed in part, and remanded.

Altice, J., and Tavitas, J., concur.